KENNETH R. JAY *v.* A & A VENTURES, LLC
(AC 30461)

DiPentima, Gruendel and Alvord, Js.

Argued October 20—officially released December 22, 2009

*Richard D. Carella,* with whom was *John H. Hagel, Jr.,* for the appellant (defendant).

*William Howard*, with whom was *David J. Tycz*, for the appellee (plaintiff).

GRUENDEL, J. The defendant, A & A Ventures, LLC, appeals from the judgment, rendered after a court trial, in favor of the plaintiff, Kenneth R. Jay. The defendant challenges as clearly erroneous the trial court's findings that (1) an agreement to refund certain escrowed moneys existed between the parties, (2) the defendant was unjustly enriched at the plaintiff's expense and (3) the defendant was unjustly enriched in the amount of $38,400. We affirm the judgment of the trial court.

In its memorandum of decision, the court found the following facts. The plaintiff "[brought] this action to recover an amount of money which he claims that the defendant . . . is holding in escrow to apply to the purchase of real estate known as 15-R Haddam Quarter Road in Durham [property]. The court has reviewed the testimony presented during the trial, assessed the credibility of the witnesses and has reviewed the documentary evidence. From the testimonial evidence and the exhibits, the court finds the facts which are hereinafter articulated.

"[The plaintiff] and Randy Whitehouse[1] each own a landscaping business. In August, 1998, they met with

---

[1] Whitehouse is not a party to this action. The precise relationship between the plaintiff and Whitehouse is unclear from the record before us. The plaintiff and Whitehouse together occupied the property during the period at issue in this appeal. At trial, the plaintiff described Whitehouse as an "associate" with whom he had "a gentleman's agreement" to "share everything on a fifty-fifty basis. We would share the outside and the inside space and share the costs." At the same time, it is undisputed that the plaintiff alone entered into the agreement at issue in this case with Charles Arrigoni and Thomas Arrigoni at a December, 1998 meeting at Thomas Arrigoni's residence on Brick Lane in Durham. It also is not disputed that it was the plaintiff who made all payments to the defendant pursuant to that agreement. Because neither party raised any issue at trial as to Whitehouse's proper role in the present dispute, we, like the trial court, do not consider that issue in resolving the present matter. We further do not express any opinion

Charles Arrigoni, the managing member of [the defendant], and his brother, Thomas [Arrigoni], and discussed the rental of [the property], for their landscaping businesses. The [property] is owned by the defendant[2] and consists of a large yard, two cold storage bays, with access to a small office area, and a bathroom. [The plaintiff] entered into an oral agreement [agreement] with [the defendant] to rent the [property] for their landscaping businesses for a period of five years, starting January 1, 1999, and ending on December 31, 2004.[3] [The plaintiff] then installed a wood stove in the storage bays. In addition, Charles Arrigoni agreed that [the plaintiff] would have an option to purchase the property for $208,000. The agreement was memorialized in part on the yellow sheet of legal sized paper [which was introduced into evidence as the plaintiff's exhibit one], prepared by Charles Arrigoni. The plaintiff and the defendant further agreed verbally that a portion of each monthly rental payment would be held in escrow, for application to the purchase price, [as evidenced in line sixteen of the plaintiff's exhibit two], which shows the escrow amounts . . . provided that the escrow amount would be returned to him if the purchase were not consummated."

as to any possible claim Whitehouse may have against the plaintiff pertaining to their gentleman's agreement.

[2] At the time that the parties entered into the agreement in 1998, Charles Arrigoni and Thomas Arrigoni owned the property. Charles Arrigoni and Thomas Arrigoni subsequently formed the defendant limited liability company and conveyed the property to that entity. The defendant sold the property to a third party, Segue to Segway, LLC, on June 29, 2007, for $325,000.

[3] The plaintiff's exhibit one, which is a yellow sheet of legal sized paper on which Charles Arrigoni memorialized certain terms of the lease agreement, is titled "Agreement to Rent Property for a Period of [Five] Years [January 1, 1999, through December 31, 2004]." Obviously, that time period contains six years, rather than five, a distinction unnoticed by the parties or the court. The parties nevertheless have agreed throughout the proceedings that the lease agreement was for a term of five years beginning in January, 1999.

The plaintiff's complaint alleged causes of action for breach of contract, conversion and unjust enrichment. In its memorandum of decision, the court concluded that the plaintiff's breach of contract claim could not be maintained, concluding that the agreement memorialized on the yellow sheet of legal sized paper failed to satisfy the statute of frauds. We concur with that assessment.

The court then focused its attention on the plaintiff's unjust enrichment claim. The court noted that paragraph six of the plaintiff's complaint stated that "[t]he parties agreed that the defendant would hold all payments made in anticipation of the purchase of the property in escrow or trust until the [p]laintiff's purchase of the property at the end of five (5) years' occupancy." Because the defendant admitted that paragraph in its answer, the court concluded that the defendant was bound by that judicial admission. On its review of the evidence presented and "considered in the context of judging the testimony of the witnesses," the court found that "the plaintiff has established that [the defendant] unjustly is holding a benefit as a result of the oral agreement to set a portion of the monthly rent into an escrow account and to return it if the purchase of the [property] is not accomplished." The court further found that the defendant was unjustly enriched in the amount of $38,400. The court rendered judgment accordingly, and this appeal followed.[4]

I

The defendant concedes that an agreement existed between the parties regarding the lease of the property,

---

[4] Although the court's memorandum of decision does not address the plaintiff's second cause of action, which alleged conversion, the judgment file indicates that "[t]he court, having heard the parties, finds the allegations in the third [unjust enrichment] count only of the plaintiff's complaint to be true . . . ." In this appeal, neither party raises any claim pertaining thereto. Similarly, no claim is raised regarding the defendant's counterclaim, on which the court found in favor of the plaintiff.

which contained an option to purchase the property at the conclusion thereof. The defendant further is bound by its judicial admission that "[t]he parties agreed that the defendant would hold all payments made in anticipation of the purchase of the property in escrow or trust until the plaintiff's purchase of the property at the end of five (5) years' occupancy." On appeal, the defendant claims that the court erroneously found that an agreement to refund the escrowed moneys in the event that the plaintiff did not purchase the property existed between the parties. We disagree.

"The law governing [our] limited appellate review is clear. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 558–59, 893 A.2d 389 (2006).

The court had before it evidence that, in December, 1998, the parties reached an agreement regarding the lease of the property for a period of five years. The plaintiff testified that, at the December, 1998 meeting at Thomas Arrigoni's residence on Brick Lane in Durham, Charles Arrigoni and Thomas Arrigoni presented a handwritten agreement prepared by Charles Arrigoni on a yellow sheet of legal sized paper that, inter alia, specified the monthly charge per year and stated that "at the end of five years [an] option to buy at $208,000,

provided all rent has been paid promptly [and] in full." That document was introduced into evidence. The plaintiff testified that the Arrigoni brothers explained that each monthly charge contained a rental and escrow component. As he stated:

"[The Plaintiff]: [W]hat I understood was, it started out the $3000 per month for year one would be $2500 for rent, $500 every month would go toward the down payment of the building, and the second year, each month $2500 would go to rent and that down payment would increase by $100 to $600 a month. The third year, $2500 a month would go for rent, and the payment would increase to $700 a month going toward the down payment. The fourth year, $2500 a month and $800 would go toward the down payment.

"The Court: Now, that's written out on the [yellow sheet of legal sized] paper here?

"[The Plaintiff]: No, it's not, Your Honor.

"The Court: Okay.

"[The Plaintiff]: But that's the way it was explained to me how that would work and at the end of the fifth year, $2500 a month would be rent and $900 a month would be going toward the down payment, which should have calculated out the difference between the $250,000 [property value] and the $208,000 [purchase price] was the money that I had paid above and beyond the rent as . . . a down payment toward the purchase of the property."

In addition, the plaintiff introduced into evidence twenty cashed checks he had written that were payable to the defendant, which all noted "rent and escrow" in the lower left corner. The plaintiff also introduced into evidence a handwritten document prepared by Charles Arrigoni in 2003. That document detailed the plaintiff's monthly payments over a five year span from 1999 to

2003. At the end of each year's entries, two numbers are listed. The first is the total payment figure. Directly underneath that figure lies a second, lesser figure representing the escrow amount attributed to the potential purchase of the property. In total, the document reflects that the plaintiff paid $188,400 over the five year period, of which $38,400 constituted escrow payments. At trial, Charles Arrigoni confirmed that those figures represented the total payments made by the plaintiff and the escrowed portions thereof. The plaintiff offered similar testimony on that point.

Thus, the court had before it competent evidence that the plaintiff made $38,400 in escrow payments over the course of the lease of the property. Although the defendant contends that there is no evidence in the record to support the court's finding that it agreed to refund those escrowed funds in the event that the plaintiff did not purchase the property, the record belies that claim. At trial, the plaintiff was specifically asked how he arrived at the understanding that his escrow funds would be refunded if he elected not to purchase the property. He testified: "I asked [Charles Arrigoni and Thomas Arrigoni] point blank. I said, if I couldn't buy this building, if I wasn't financially able, or I didn't want to buy this building for any number of reasons, would I get my money back, and they said yes . . . ." When asked what would have happened if the defendant had informed him that the escrowed funds were not refundable, the plaintiff replied that "[t]he deal would have been done. . . . I would have walked out. . . . If I knew I could never get my money back, then I would have got up and looked for another place immediately." In response to the court's question as to whether it was Charles Arrigoni and Thomas Arrigoni "who said you would get your money back," the plaintiff testified that he could not recall precisely which brother so stated. The court later inquired "regarding the statement made

by one of the Arrigonis that they would return your escrow . . . when was that made?" The plaintiff testified that the statement was made at the December, 1998 meeting at Thomas Arrigoni's Brick Lane residence. That evidence supports the court's finding that an agreement existed between the parties to refund the escrowed moneys in the event that the plaintiff did not purchase the property.

It is true that Charles Arrigoni offered conflicting testimony at trial.[5] The court, as trier of fact and, hence, sole arbiter of credibility, was "free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *DiVito* v. *DiVito*, 77 Conn. App. 124, 138, 822 A.2d 294, cert. denied, 264 Conn. 921, 828 A.2d 617 (2003). Notably,

[5] Charles Arrigoni at trial averred that the escrow amount was a nonrefundable credit. As he explained to the court:

"The Court: And . . . the balance [of each monthly payment] would be what?

"[The Witness]: Well, that was all—it was all rent. We handled it all as rent. That's it. It was all rent; however, we would give him a credit of this amount toward . . . the purchase of the building. . . . [I]f he purchased the building, we had a price of $250,000 set on the price. If he purchased the building at the end of the period of five years, because we had taken all this money in as rent . . . we would give him this amount of money as credit toward the $250,000, and the sale of the building would be less.

"The Court: Okay.

"[The Witness]: Less that figure.

"The Court: Okay. And if he didn't buy it?

"[The Witness]: We were going to keep the money. It was rent. We paid rent on it. We put it all in as rent in our business. . . . It made no sense to us to give the money back . . . toward anything if he wasn't going to buy it. We, you know, we—

"The Court: Did you tell him—

"[The Witness]:—needed the money to do what we had to do with—

"The Court: Did you tell him that during the meeting?

"[The Witness]: Definitely so, sir.

"The Court: What did you tell him?

"[The Witness]: I told him that these credits would be· only good if he purchased the property, period. We weren't going to give him all that money back for nothing. For what? Unless he—we would just lower the down payment on a building if he purchased the building. That was our agreement."

the court emphasized in its memorandum of decision that its factual findings derived in part from its assessment of the credibility of the witnesses. The court similarly reached its ultimate determination that the defendant had been unjustly enriched by its refusal to return the escrow payments by considering the evidence before it "in the context of judging the testimony of the witnesses . . . ." Although the defendant offered conflicting testimony, the memorandum of decision plainly indicates that the court credited the plaintiff's testimony and rejected that of the defendant's sole witness, Charles Arrigoni. Such is the exclusive prerogative of the trier of fact, with which this court will not interfere on appeal. See *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 728, 941 A.2d 309 (2008) (appellate court must defer to trier of fact's assessment of credibility); *Klein* v. *Chatfield*, 166 Conn. 76, 80, 347 A.2d 58 (1974) ("trier is privileged to adopt whatever testimony it reasonably believes to be credible"); *Talton* v. *Warden*, 33 Conn. App. 171, 179, 634 A.2d 912 (1993) ("[w]e cannot . . . pass on the credibility of a witness"), aff'd, 231 Conn. 274, 648 A.2d 876 (1994). Because there is supporting evidence in the record, we conclude that the finding that an agreement existed to refund the escrowed moneys in the event that the plaintiff did not purchase the property was not clearly erroneous.

II

The defendant next claims that the court erroneously found that it was unjustly enriched at the plaintiff's expense. That argument is unavailing.

Certain well established principles guide our analysis of the defendant's claim. "[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract, restitution of the value of

what has been given must be allowed. . . . Under such circumstances, the basis of the plaintiff's recovery is the unjust enrichment of the defendant. . . . A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 451–52, 970 A.2d 592 (2009).

"[E]quitable remedies are not bound by formula but are molded to the needs of justice." *Montanaro Bros. Builders, Inc.* v. *Snow*, 4 Conn. App. 46, 54, 492 A.2d 223 (1985). Our Supreme Court has described unjust enrichment as a very broad and flexible equitable doctrine. *Gagne* v. *Vaccaro*, 255 Conn. 390, 409, 766 A.2d 416 (2001), on appeal after remand, 80 Conn. App. 436, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004). That doctrine is "based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated. . . . The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?" (Internal quotation marks omitted.) *New*

*Hartford* v. *Connecticut Resources Recovery Authority,* supra, 291 Conn. 452. Review of a trial court's resolution of that question "is deferential. The court's determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings . . . that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) Id. With those principles in mind, we turn to the defendant's claim.

The defendant maintains that the court erroneously found that it had been unjustly enriched by the retention of the escrow payments made by the plaintiff. That claim is predicated entirely on the defendant's allegation that the record contains no evidence that an agreement to refund the escrowed moneys in the event that the plaintiff did not purchase the property existed between the parties. We already have rejected that contention in part I. The defendant also argues that "the parties' own testimony was that they treated all of the payments as rent and never treated any of the money as being held in escrow." That statement confounds the defendant's judicial admission, by which it is bound in this proceeding, that "[t]he parties agreed that the defendant would hold all payments made in anticipation of the purchase of the property in escrow or trust until the plaintiff's purchase of the property at the end of five (5) years' occupancy."

In the present case, the court found that the defendant benefited to the plaintiff's detriment by its unjust retention of his escrow payments after he elected not to purchase the property. We agree. On the record

before us, we conclude that the court's finding that the defendant was unjustly enriched was not clearly erroneous.

## III

The defendant's final claim is that the court erroneously calculated the amount by which the defendant was unjustly enriched. "[T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 68–69, 717 A.2d 724 (1998).

At trial, Charles Arrigoni testified that the plaintiff's exhibit two was his handwritten document detailing the "actual payments" made by the plaintiff from 1999 to 2003. He further confirmed that the figures contained on line sixteen therein documented the escrowed portions of the payments made by the plaintiff. That escrow portion totaled $38,400, the same figure contained in the plaintiff's August 10, 2004 letter formally demanding the "return of all escrowed funds," which was introduced into evidence as the plaintiff's exhibit ten, as well as the same amount alleged to have been wrongfully withheld by the defendant in the plaintiff's complaint.

In addition, the plaintiff testified that the figures contained in exhibit two set forth the amounts that he actually had paid to the defendant. On that evidence, we cannot say that the court's calculation of damages was clearly erroneous.

The defendant also argues, for the first time on appeal, that the award of damages amounts to a windfall to the plaintiff in light of his relationship with Whitehouse. See footnote 1. He argues that, because Whitehouse allegedly paid the plaintiff half of each monthly charge under the lease agreement, the court "awarded [the plaintiff] double the amount he actually contributed." The defendant failed to raise that claim at trial, in its November 5, 2007 posttrial memorandum of law or in its subsequent March 19, 2008 motion to reargue and for reconsideration. Furthermore, the defendant did not request an articulation of the court's damages award. See Practice Book § 66-5. To review a claim advanced for the first time on appeal and not raised before the trial court amounts to a trial by ambuscade of the trial judge. *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 798, 967 A.2d 1 (2009). We therefore decline to afford review on this unpreserved ground.

The court's calculation of the amount by which the defendant was unjustly enriched finds support in the record before us. Thus, that finding was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.