******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBERT ROUSSEAU *v.* MADELEINE PERRICONE
(AC 34957)

Beach, Bear and West, Js.

*Argued November 19, 2013—officially released March 25, 2014*

(Appeal from Superior Court, judicial district of Hartford, Abery-Wetstone, J.)

*Daniel J. Klau*, for the appellant (defendant).

*Daniel D. Dwyer*, with whom were *Robert Rousseau*, self-represented, *Jon L. Schoenhorn* and, on the brief, *Timothy J. Fitzgerald*, for the appellee (plaintiff).

*Opinion*

BEACH, J. In this marital dissolution action, the defendant, Madeleine Perricone, challenges certain property distribution and orders entered by the trial court in its judgment dissolving her marriage to the plaintiff, Robert Rousseau. The defendant claims that the court erred (1) by failing to strike the testimony of a certain witness after he refused to answer certain questions on cross-examination; (2) by not ordering the plaintiff to repay to her $500,000 that the defendant had transferred to him; (3) in ordering her to release the plaintiff and to hold him harmless from a pending civil action she had commenced in the trial court; and (4) in imposing a sanction on her for a discovery violation that her attorney allegedly committed. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The parties met in November, 2006, through a dating service and married in July, 2007. They did not commingle assets during the marriage except for investments in various cosmetics companies located in California.

The plaintiff had multiple business interests that predated his marriage to the defendant. His principal business was Preferred Display Incorporated (Preferred Display), which manufactured displays for the cosmetics industry and had a worldwide customer base. The parties initially resided in a modest four bedroom ranch style home in Glastonbury. The defendant later purchased a larger home on Drumlin Road in Glastonbury.

Prior to their marriage, the parties traveled to California and had business discussions with various persons in the cosmetics industry, including Harry Haralambus. The defendant invested approximately $2 million and the plaintiff invested approximately $2.5 million in California cosmetics companies. As of the last day of trial, neither the plaintiff nor the defendant had seen a return on their investments.

The court did not find any merit to the defendant's claims that she made investments in the California cosmetics companies because of fraud, duress or undue influence on the part of the plaintiff. The court found that the investments were risky and that both the plaintiff and the defendant voluntarily made what turned out to be bad investments. The court also imposed a $25,000 sanction on the defendant for failure to comply with discovery orders. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the court erred in failing to strike the testimony of Haralambus after he refused to answer certain questions on cross-examination.

We disagree.

Haralambus testified on direct examination that he had interests in cosmetics companies in California. The plaintiff and the defendant had invested in at least one of the same companies. Haralambus wanted to enhance the value of the companies by combining them into a holding company. He testified that "[t]he holding company had been set up. However, the problem was that in order to complete the process, we had to have this discussion with each individual shareholder and get a decision from them as to whether they wanted to swap their stock in an individual entity with the appropriate amount of stock in the holding company. . . . [I]t was important to have everybody interested in the holding company, because that way, we could act in unity." Haralambus testified that other investors in California were "on board" with the holding company idea. He stated that both the plaintiff and the defendant delayed making decisions. Haralambus indicated that he was "frustrate[d]" by being "put in this hold pattern by two very important shareholders." He testified that the plaintiff damaged his chance of recovering on his investment when "he failed to vote . . . to move forward." He also testified that the defendant harmed her chance of recovering on her investment by failing, as did the plaintiff, "to move forward with what was agreed and arranged upon."

On cross-examination, the following colloquy occurred:

"[The Defendant's Counsel]: Do you have documents concerning the consolidation or merger of these entities?

"[Haralambus]: The proper final consolidation has not occurred, because it's being held up by two shareholders or more. Correctly speaking, one shareholder, Madeleine, LLC.[1] . . .

"[The Defendant's Counsel]: Can you tell me which ones have?

"[Haralambus]: It's confidential information.

"[The Defendant's Counsel]: Your Honor, I–the witness has to be instructed to answer.

"The Court: You need to answer the question.

"[Haralambus]: I'd be breaching confidentiality agreements if I did."

The defendant's counsel argued that "[t]his is all about the decision by [the plaintiff] to call [Haralambus] to testify that because of [the defendant's] refusal to cooperate and become part of a roll up into a holding company, that the whole thing is now unprofitable and that now . . . Haralambus is in trouble. And I have an opportunity here . . . to check [Haralambus'] credibility to see whether or not what he's saying to the court is

credible." The court suggested that Haralambus answer the following question: "Out of all the shareholders and investors that you have that you wanted to consolidate into this holding company, has everybody signed agreements to do so, but the two people sitting in the courtroom?" To which Haralambus answered in the negative. The court then asked: "So, it would be fair to say that the failure to consolidate everything into this holding company and the impact that it's had on the business isn't solely the result of these two people in this courtroom?" Haralambus answered: "That may well be so, Your Honor." The defendant's counsel informed the court that he wanted to know how many companies voted against consolidation into a holding company and which ones. Haralambus explained that those questions place him in a difficult position in which he is "losing the ability to defend myself and those companies from legal assault." The defendant's counsel agreed to address the question of the confidentiality agreement at a later date.

At his next court appearance, Haralambus was represented by counsel. Haralambus' counsel requested that the court conduct an in camera review of the confidentiality agreement. The court did so. The defendant's counsel again stated that he wanted to question Haralambus regarding the identity of the entities that had not wanted to consolidate, because such testimony "impeaches the witness' testimony further." The court stated: "He's already said that there are other entities or people that did want to roll up. You've made your point." The court concluded that the agreement was "between people who are not part of this case, not present in this courtroom, and they're entitled to their confidentiality. Additionally, the court's going to make a finding that there is no relevance of this to the present case." The defendant's counsel orally moved for a mistrial and to strike Haralambus' testimony. He argued that the court's ruling that the confidentiality agreement barred Haralambus from disclosing the identities of the other entities involved in the consolidation effort adversely affected his ability to cross-examine Haralambus. The court denied both motions.[2]

The defendant argues that "[b]eyond the parties themselves, there is no witness more central to the financial shenanigans in this case than . . . Haralambus. . . . The plaintiff offered the testimony of Haralambus to shift blame for the defendant's loss of her investment away from Haralambus' and the plaintiff's financial shenanigans and onto the defendant for refusing to participate in the consolidation or 'roll up' of the individual companies into a single holding company, which allegedly would have enhanced the overall value of the companies. . . . Haralambus testified on direct examination that all of the investors had agreed to the consolidation of the cosmetic companies into a holding company except the defendant, and that her refusal

was responsible for the lack of financial success of the enterprise."[3] (Emphasis omitted.) The defendant argues that the court's failure to permit cross-examination on a "critical issue" was erroneous and deprived her of her due process rights.

"In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . Although it is axiomatic that the scope of cross-examination generally rests within the discretion of the trial court, [t]he denial of all meaningful cross-examination into a legitimate inquiry constitutes an abuse of discretion." (Internal quotation marks omitted.) *Corriveau* v. *Corriveau*, 126 Conn. App. 231, 236–37, 11 A.3d 176, cert. denied, 300 Conn. 940, 17 A.3d 476 (2011).

The court did not abuse its discretion in not permitting inquiry into the identity of other investors in the California cosmetics companies venture. Testimony was elicited from Haralambus that there were persons or entities other than the parties that did not agree to consolidate, and Haralambus agreed that it "may well be" that the failure to consolidate was not solely the result of the parties' actions. The identity of the other investors that were not in favor of consolidation was not material to the issue of the defendant's claim of financial misconduct on the part of the plaintiff or to any impeachment of the witness. Furthermore, the cross-examination of Haralambus was extensive and is reported on more than 150 pages of transcript. It covered a variety of issues involving the "roll up" and other financial aspects of the California cosmetics companies venture. We conclude that the court did not abuse its discretion[4] in not permitting inquiry into the identities of other investors involved in the consolidation discussions.

## II

The defendant next claims that the court erred by not ordering the plaintiff to repay $500,000 that she had transferred to him. We disagree.

"We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Loughlin* v. *Loughlin*, 93 Conn. App. 618, 624, 889 A.2d 902, aff'd, 280 Conn. 632, 910 A.2d 963 (2006).

The court found that the plaintiff began investing in the California cosmetics companies in August, 2008, and that most of the money had been transferred from the plaintiff's checking account. The court found that two sources of the deposits into the plaintiff's checking account, in turn, were wire transfers from the defendant's UBS account in the amount of $250,000 each. The court did not find any basis for the defendant's claim that she made investments in the California cosmetics companies because of fraud, duress or undue influence on the part of the plaintiff. The court emphasized that both parties had been warned that the investments were risky and that neither had realized a return on the investments as of the last day of trial. The court further found that the defendant "blamed her husband and scores of others for her decisions and took no personal responsibility."

The defendant claims that she did not authorize the wire transfers into the plaintiff's account and that, "[i]n a calculated and convoluted manner," the $500,000 was transferred through various companies and ended up in the hands of Haralambus. She concludes that "[t]he plaintiff was clearly double dealing with Haralambus to the disadvantage of the defendant . . . Haralambus got his money, the plaintiff got his investment and [the defendant] lost her money."

The defendant's interpretation of events was not what was found by the trial court. The court's finding that the $500,000 was part of the defendant's knowing investment in the California cosmetics companies venture was not clearly erroneous.[5] See, e.g., *Miller* v. *Guimaraes*, 78 Conn. App. 760, 766–67, 829 A.2d 422 (2003) (trial court's factual findings reviewed under clearly erroneous standard). The court did not abuse its discretion in declining to award to the plaintiff the $500,000 that she had invested in a business venture.

### III

Prior to the trial in this action, the defendant had initiated a separate action against the plaintiff, Preferred Display and others. She claimed to have been harmed by essentially the same financial transactions that were subjects of dispute in the present action. The defendant claims, in this appeal, that the court erred in ordering her to release the plaintiff and to hold him harmless regarding the pending civil action in the trial court. We disagree.

The question central to the resolution of this issue is whether the pending civil action is "property" subject to distribution under General Statutes § 46b-81. Our standard of review of claims involving statutory interpretation is plenary. See *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998).

The trial court stated that it had "examined the civil suit filed by the defendant against the plaintiff, [Pre-

ferred Display] and numerous others. The allegations raised against the plaintiff and [Preferred Display] are more specific and detailed but essentially the same allegations raised by the defendant in the dissolution action."[6] The court determined that pursuant to *Lopiano*, the civil action was an asset that the court could properly consider in the mosaic of its property division. The court ordered that "[t]he defendant shall release and hold the plaintiff and his company [Preferred Display] indemnified and harmless from any and all claims of action pending in Hartford Superior Court captioned *Perricone* v. *Rousseau*, bearing docket number HHD-CV-11-6027402-S. In addition, the defendant shall be responsible for 100% of [the] plaintiff's legal fees in defending the civil action if [the] plaintiff and/or his company remain parties to that action."

In *Lopiano* v. *Lopiano*, supra, 247 Conn. 363, our Supreme Court held that a personal injury award is a property interest encompassed within the meaning of "property" under § 46b-81 and therefore available for distribution in a marital dissolution action. In reaching this conclusion, the court examined the definition of "property" under § 46b-81. Id., 363–66. "The distribution of assets in a dissolution action is governed by § 46b-81, which provides in pertinent part that a trial court may assign to either the husband or the wife all or any part of the estate of the other. . . . In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider" various factors relevant to the property distribution. (Internal quotation marks omitted.) Id., 363–64. "There are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." Id., 364. In defining the term "property" in *Lopiano*, our Supreme Court stated: "Rather than narrow the plain meaning of the term property from its ordinarily comprehensive scope, in enacting § 46b-81, the legislature acted to expand the range of resources subject to the trial court's power of division, and did not intend that property should be given a narrow construction. . . . [O]ur broad definition of property was not entirely without limitation, and that property under § 46b-81 includes only interests that are presently existing, as opposed to mere expectancies." (Citations omitted; internal quotation marks omitted.) Id., 365–66.

Our Supreme Court in *Mickey* v. *Mickey*, 292 Conn. 597, 618–19, 974 A.2d 641 (2009), further explained: "The legislature has not seen fit to define [the] critical term [property within the meaning of § 46b-81], leaving it to the courts to determine its meaning through appli-

cation on a case-by-case basis. Neither § 46b–81 nor any other closely related statute defines property or identifies the types of property interests that are subject to equitable distribution in dissolution proceedings. . . . As we noted previously, this court has generally taken a rather broad and comprehensive view of the meaning of the term property for purposes of equitable distribution. . . . We have not erased altogether, however, the limitations inherent in the term. We continue to recognize that the marital estate divisible pursuant to § 46b–81 refers to interests already acquired, not to expected or unvested interests, or to interests that the court has not quantified. . . . Our cases thus have generally divided the various contested property interests under § 46b–81 by characterizing them as either presently existing and enforceable and, therefore, distributable . . . or mere expectancies immune from equitable distribution." (Citations omitted; internal quotation marks omitted.)[7]

The cause of action in *Perricone* v. *Rousseau*, supra, Superior Court, Docket No. CV-11-6027402-S, is "property" for the purpose of § 46b-81. "There is no doubt that a right in action, [when] it comes into existence under common-law principles, and is not given by statute as a mere penalty or without equitable basis, is as much property as any tangible possession . . . ." (Internal quotation marks omitted.) *Silver* v. *Silver*, 112 Conn. App. 145, 150, 151 A. 524 (1930); see also *Lopiano* v. *Lopiano*, supra, 247 Conn. 370 (right of action characterized as property under § 46b-81). "The value of the chose in action, on the other hand, determined at least in part by the party's chances of prevailing, may be unknown, and, indeed, the action may turn out to be worthless. Nevertheless, that fact is irrelevant to its classification as a property interest. See, e.g., *Bender* v. *Bender*, [258 Conn. 733, 749–50, 785 A.2d 197 (2001)] (classification stage distinct from valuation stage in analyzing potential interests for equitable distribution)." (Emphasis omitted; internal quotation marks omitted.) *Mickey* v. *Mickey*, supra, 292 Conn. 624 n.20; see also *Massa* v. *Nastri*, 125 Conn. 144, 147, 3 A.2d 839 (1939) ("[a] right of action . . . is a vested property interest, before as well as after judgment").

As discussed previously, *Lopiano* mandates a three stage inquiry. The first issue is whether the item in question is properly characterized as property. If it is property, the next issues are valuation and equitable distribution. The remaining issues are easily resolved. In the present case, the court had no need to resolve the issue of valuation, because no proceeds of the civil action could flow directly or indirectly from the plaintiff to the defendant pursuant to the court's order. If, on the other hand, the defendant should recover any proceeds independently from any defendant other than the plaintiff or Preferred Display in the civil action, she would be entitled to keep for herself all of those assets. Simi-

larly, the court did not abuse its discretion in the distribution of the proceeds of the right of action. Anything the defendant could recover from third parties was hers; nothing was to come from the plaintiff and he was to be made whole for any future litigation costs regarding the civil action. In light of the court's determination that there had been no financial manipulation, which finding is not clearly erroneous, the order regarding the civil case was well within the court's discretion and served to maintain the status quo of the overall property mosaic.

Finally, the defendant argues that even if the pending civil action was property for purposes of § 46b-81, the order at issue was not a property distribution order because it did not transfer title or ownership of property from the defendant to the plaintiff. We disagree. Most, if not all, divisions of property pursuant to § 46b-81 leave some property in the hands of its owner. Although some property may be transferred from one spouse to the other, § 46b-81 does not require that to occur in all cases. The order concerning the civil action preserved the status quo regarding the court's other orders concerning the subject property and avoided what the court viewed as an inequitable result. There was no abuse of discretion.

IV

The defendant last claims that the court erred in imposing a sanction of $25,000 in attorney's fees for a discovery violation that was allegedly committed by her attorney. The defendant argues that (1) the court's finding of a discovery violation on the part of her attorney was clearly erroneous; (2) even if that finding was not clearly erroneous, the court erred in imposing a sanction on the defendant because of the alleged conduct of her attorney in not producing a computer disc to the plaintiff; and (3) the $25,000 sanction imposed had no basis in the evidence. We disagree.

"[T]he common law rule in Connecticut, also known as the American Rule, is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *Berzins* v. *Berzins*, 306 Conn. 651, 657, 51 A.3d 941 (2012). One limited exception to that rule in dissolution actions "provide[s] a trial court with the discretion to award attorney's fees to an innocent party who has incurred substantial attorney's fees due to the egregious litigation misconduct of the other party when the trial court's other financial orders have not adequately addressed that misconduct." (Internal quotation marks omitted.) Id., 658, quoting *Ramin* v. *Ramin*, 281 Conn. 324, 351, 915 A.2d 790 (2007). A trial court has "the discretion to award attorney's fees to a party who incurs those fees largely due to the other party's egregious litigation misconduct . . . ." *Ramin* v. *Ramin*, supra, 353. The

term "egregious litigation misconduct" is limited to discovery misconduct. *Berzins* v. *Berzins*, supra, 658.

The court noted that the plaintiff began requesting discovery from the defendant in 2011, and that the court entered discovery orders in March, June, July and September, 2011. The court found that the defendant failed to comply with these court orders, in that attorney billing records and certain bank records were not fully produced. The court noted that the defendant's attorney had testified that a UBS computer disc containing financial records was not produced because, even though the requested material had been clearly described, the attorney did not think that it contained material that the plaintiff wanted. The court stated that "[i]t is not up to the defendant to decide what information is relevant to the preparation of the plaintiff's case." In September, 2011, a fine of $50 per day, doubling daily, was imposed on the defendant for noncompliance. The trial court noted that because the orders were never fully complied with through the end of the trial, the sanction would be more than the defendant's net worth. The court found that the defendant had had the ability to comply with the court orders regarding discovery, that *the defendant* and her lawyers were fully aware of the orders, and that they wilfully failed to comply with them. The court imposed a sanction of $25,000 on the defendant for failing to comply with the discovery orders.

First, the defendant argues that the court erred in finding that her prior attorney, Carlo Forzani, committed a discovery violation. In support of her argument, she cites the testimony of Forzani and argues that, once Forzani was aware that the plaintiff wanted the UBS computer disc, he provided it to him. Although the court, as trier of fact, can reject any portion of testimony it deems not credible; see *Jay* v. *A & A Ventures, LLC*, 118 Conn. App. 506, 514, 984 A.2d 784 (2009); Forzani's testimony was not necessarily inconsistent with the court's finding that some documents were not produced in a timely fashion after the court had ordered them to be produced. Additionally, some documents were never produced despite the fact that they were available. In the portion of testimony cited by the defendant, Forzani stated that it never occurred to him to give the plaintiff the UBS computer disc, and, after the court ordered him to do so, he encountered a delay because "Staples didn't want to do all this work." Further, the defendant contests only the court's finding of a discovery violation with respect to the UBS computer disc, but apparently does not contest the finding with respect to the attorney billing records, Citizen Bank records, and Valley Bank records, which the court also determined were not fully produced despite the court's clear order. Accordingly, we conclude that the court's finding of a discovery violation was not clearly erroneous.

Second, the defendant argues that, even if the court's finding of a violation was not erroneous, the violation was not attributable to her and "[t]he trial court expressly found that *Attorney Forzani*, not the defendant, decided not to produce the computer disc to the plaintiff." (Emphasis in original.) The court's finding of a violation did not rest solely on the issue of the UBS computer disc, but as stated previously, concerned other documents, such as bank account records, as well. The court's finding of a violation as to these remaining items remains unchallenged. Furthermore, regardless of the court's finding that Forzani did not think that the plaintiff wanted the UBS computer disc, the court's finding that "[*t*]*he defendant* and her lawyers were fully aware of the court orders and wilfully failed to comply with the court orders" remains unchallenged. (Emphasis added.)

Third, the defendant argues that "the $25,000 sanction appears to be a number that the court pulled out of the air." "A trial court may rely on its own general knowledge of the trial itself to supply evidence in support of an award of attorney's fees. . . . The amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . ." (Citation omitted; internal quotation marks omitted.) *Food Studio, Inc.* v. *Fabiola's*, 56 Conn. App. 858, 865, 747 A.2d 7 (2000).

The court was familiar with the history of the case and the extent of attorney activity. In its discussion of the sanction for discovery abuse, the court referenced attorney's fees in the amount of $25,553.91 for dealing with the defendant's incomplete financial records. We hold that, in the circumstances of this case, a sanction in the amount of $25,000 was reasonable. The court did not abuse its discretion in setting the amount of the sanction.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court found that the plaintiff and defendant were 49 percent owners of Madeleine, LLC.

[2] The defendant argues that the court erred in denying her oral motions for a mistrial and to strike Haralambus' testimony. Because we conclude that the court did not impermissibly limit the cross-examination of Haralambus, we determine that the court did not err in denying these motions.

[3] On direct examination, however, Haralambus also placed blame for the lack of financial success on the plaintiff.

[4] The court apparently attached some importance to the confidentiality agreement. Because of the lack of materiality of the issue of identity, the court did not need to determine the weight, if any, to be accorded to any expectation of privacy created by the agreement.

[5] For example, Arnaldo Marinelli, a friend of the parties who was involved in the California cosmetics company venture, testified that the defendant was aware of the wire transfers, that she "jumped in, gave [the plaintiff] the money, supposedly, and the money went out to California."

[6] *Perricone* v. *Rousseau*, Superior Court, judicial district of Hartford, Docket No. CV-11-6027402-S, was brought against multiple defendants, including the plaintiff in this matter and Preferred Display. The allegations against the plaintiff include: that he had manipulated the defendant into investing in the California venture, had caused her to replace her attorney, and had convinced her to acquire a certain home in Glastonbury. She claimed that the plaintiff had deceptively had her execute an equity loan on the Glastonbury property in the amount of $800,000. The court in the present dissolution action determined that the plaintiff had exercised no undue influence or duress and had committed no fraud in the context of the failed California investments, that there was no merit to the defendant's claims that the plaintiff had deprived her of legal counsel, that the plaintiff had been the driving force behind the purchase of the Glastonbury home, and that the defendant failed to meet her burden of proof to show that the plaintiff had not repaid the defendant in full for the home equity line of credit taken out on the Glastonbury property.

[7] In *Mickey* v. *Mickey*, supra, 292 Conn. 625–33, our Supreme Court discussed *Bender* v. *Bender*, 258 Conn. 733, 785 A.2d 197 (2001), in which a middle ground, not relevant to the present case, was carved out.