******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FERNWOOD REALTY, LLC *v.* AEROCISION, LLC
(AC 37627)

DiPentima, C. J., and Keller and Prescott, Js.

*Argued February 1—officially released June 21, 2016*

(Appeal from Superior Court, judicial district of
Middlesex, Aurigemma, J.)

*Jeffrey J. White*, with whom were *Kathleen E. Dion* and, on the brief, *Sorell E. Negro*, for the appellant (defendant).

*Hugh D. Hughes*, with whom was *Stephen R. Sheehan*, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, C. J. The defendant, AeroCision, LLC, appeals from the judgment, rendered after a court trial, in favor of the plaintiff, Fernwood Realty, LLC. On appeal, the defendant claims that the court (1) erroneously concluded that it had committed statutory theft of components from an electrical distribution system because the defendant was the rightful owner of those components, and that there was no evidence to support the defendant's good faith belief that it owned those components, (2) erred in its interpretation of a commercial lease, and (3) misapplied the legal standard with respect to the defendant's constructive eviction counterclaim. We affirm the judgment of the trial court.

The following procedural history is relevant to this appeal. The plaintiff's operative amended complaint, filed on January 11, 2010, alleged, inter alia, that the defendant committed statutory theft in violation of General Statutes § 52-564 and breached its contract by defaulting on a commercial lease.[1] The defendant filed an answer, special defenses, and a counterclaim. Relevant to this appeal are counts one and two of the counterclaim, which sought to recover damages for the plaintiff's alleged breach of the terms of a commercial lease, and count six, which alleged that the plaintiff constructively evicted the defendant.

A bench trial was conducted over six nonconsecutive days, beginning on June 19, 2014, and ending on July 31, 2014. After the court, *Aurigemma, J.*, reviewed the parties' proposed statements of fact, posttrial briefs, and replies to the posttrial briefs, it issued its memorandum of decision on December 18, 2014. The court rendered judgment in favor of the plaintiff on its statutory theft and breach of contract counts, and it rendered judgment in favor of the plaintiff on all counts of the defendant's counterclaim.[2]

The following facts, as found by the court, are relevant to this appeal. Donald F. Woods (Donald) acquired 167 Elm Street (property), a commercial manufacturing building in Old Saybrook, in 1984.[3] The bus ducts,[4] branch feeders,[5] and transformer (electrical components) that formed the basis for the plaintiff's statutory theft claim were installed in 1990. On November 30, 2001, Donald, Jeffrey D. Woods (Jeffrey), his son, and Barbara A. Woods (Barbara), his daughter, quitclaimed their interest in the property[6] to a three member limited liability company, the plaintiff, of which they were each a member. After the plaintiff acquired ownership of the property, it leased the property to an entity that the Woods family members owned, Pye & Hogan Machine Company, Inc. (Pye & Hogan), for $17,000 per month.

Starting in 2004, Jeffrey and Donald began negotiations to sell Pye & Hogan to Patrick G. Bromley, a Texas businessman who had "engaged in extensive business

investments on behalf of a large employer and . . . on his own behalf." On May 5, 2005, the sale was finalized, and Pye & Hogan sold many of its assets, including its personal property, to Pye & Hogan, LLC, through an asset purchase agreement (agreement). On the following day, the plaintiff and Pye & Hogan, LLC, entered into a lease agreement (lease) in which Pye & Hogan, LLC, would rent the property for sixty months, ending on May 6, 2010, for the amount of $17,000 per month. Shortly after signing the lease, Pye & Hogan, LLC, changed its name to AeroCision, LLC, the defendant in this matter.

In December, 2009, the defendant notified the plaintiff that it was vacating the property. It alleged that it had been constructively evicted because of "water intrusion" and a nonfunctioning toilet. Additionally, the defendant alleged that Donald threatened its employees with violence, which left it "no choice but to vacate the property to protect its employees."[7] (Internal quotation marks omitted.) The plaintiff responded in a letter stating that the defendant was not to remove various items from the property, including the electrical components. Afterward, the plaintiff filed its original complaint on December 14, 2009. In conjunction with its original complaint, the plaintiff sought an ex parte temporary injunction ordering the defendant not to remove items that belonged to the plaintiff, namely, "fire alarm and fire suppression systems, electric [bus] ducts and electrical raceway, electrical panels, electrical conduit, mounted and attached fixtures and light fixtures, electrical boxes." The plaintiff's ex parte temporary injunction was denied that same day.[8]

During the process of removing items from the property, the defendant changed the locks to the property. As a result, the plaintiff could not "[oversee] in any manner the removal of items from the property." Subsequently, the defendant relocated the bus ducts to its new location.[9] In January, 2010, the defendant provided the plaintiff with keys to the new locks. The plaintiff then hired John M. Lamb[10] to inspect the electrical distribution system. Lamb discovered that the electrical components were missing. He opined that it would cost $181,300 to replace the missing electrical components.[11] Additionally, the property was left in disrepair, and the plaintiff spent $34,614.30 to repair it.

The court found that the defendant had violated § 52-564[12] and awarded the plaintiff $543,900.[13] As to the plaintiff's breach of contract claim, it awarded the plaintiff $219,251.46.[14] This appeal followed. Additional facts will be set forth as required.

I

The first issue raised by the defendant on appeal consists of two interrelated claims. It first claims that the court improperly concluded that it had committed

statutory theft because either the court "ignored centuries of legal precedent making the distinction between 'fixtures' and 'trade fixtures,' " or the court's conclusion was "contrary to Supreme Court precedent." In the alternative, the defendant claims that it could not have committed statutory theft because it had a good faith belief that it owned the electrical components. We address each claim in turn.

A

The following additional facts are necessary to provide context to the defendant's first claim. Section 2.1 (a) (ii) of the agreement stated, in relevant part, that Pye & Hogan would "sell, assign, transfer, convey and deliver . . . to [the defendant], and the [defendant would] purchase and accept . . . all of the assets, properties . . . including all right, title and interest of [Pye & Hogan] in . . . the personal property described in <u>Schedule 2.1 (a) (ii)</u>, together with the fixtures, furnishings, furniture, equipment . . . [and] property owned or leased by [Pye & Hogan], wherever located, or acquired by [Pye & Hogan] in connection with conduct of the [b]usiness . . . or used by [Pye & Hogan] in connection with the conduct of the [b]usiness . . . ." (Emphasis in original.) Schedule 2.1 (a) (ii) listed the individual machinery (e.g., CNC Toyota FH45 NM6424), the furniture and fixtures (e.g., telephone system and equipment), the data processing equipment (e.g., printers and computers), and the vehicles. Section 2.2 of the agreement set forth that certain assets were excluded from the sale. Schedule 2.2 (d) of the agreement listed the excluded assets. The electrical components were not listed in either schedule.

In the agreement, Pye & Hogan made two important representations. First, it represented that it did not own the real property but, rather, leased it. The relevant portion of that provision of the agreement stated that to Pye & Hogan's "knowledge, each item of [l]eased [r]eal [p]roperty ha[d] adequate Utilities . . . of a capacity and condition to serve adequately such [r]eal [p]roperty . . . . [T]he term '<u>Utilities</u>' means all of the following: water distribution and service facilities; sanitary sewers and associated installations . . . *electrical distribution and service facilities* . . . and all other utility lines, conduit, pipes, ducts, shafts, equipment, apparatus and facilities." (Emphasis altered.) Second, Pye & Hogan represented that the purchased assets "constitute[d] all of the assets used in connection with the [b]usiness . . . ."

Jeffrey was questioned at length during trial with respect to the electrical components. He testified that, after a fire in 1989 destroyed the building that Pye & Hogan had used for its business, Donald—with his own money—bought the necessary machinery and the electrical components for Pye & Hogan to continue with the business.[15] The machinery and the electrical compo-

nents were installed in a temporary location. When the construction of the new building was completed in 1990, the machinery and the electrical components were installed in the property.[16] Jeffrey was directly asked who, at the time of the purchase, owned the bus ducts. He testified that Donald owned them until Donald transferred part of his ownership interest in the property to Jeffrey and Barbara; see footnote 6 of this opinion; who, along with Donald, then transferred ownership to the plaintiff.

Jeffrey was also questioned extensively by the defendant's counsel on the language of the agreement. Jeffrey asserted that the agreement did not include the sale of the bus ducts. In an attempt to impeach this testimony, the defendant's counsel had Jeffrey read the relevant portions of the agreement discussing the assets to be sold and the assets to be excluded. The defendant's counsel then took the position that because schedule 2.1 (a) (ii) was not an exhaustive list and the bus ducts were not listed as excluded assets, the bus ducts were part of the transaction. Jeffrey did not agree, and, on redirect examination, he testified that it was intended that the bus ducts installed in the property were to be permanent.

Donald was called to testify on the fourth day of trial. During a brief direct examination, he testified that, inter alia, it was his intention that the electrical distribution system installed in the property was to be permanent. The cross-examination, which consisted of five questions relating to the property and two relating to Pye & Hogan, did not provide additional testimonial evidence about the electrical distribution system.

We first set forth the appropriate standard of review. The defendant asserts that its first challenge to the court's conclusion that it had committed statutory theft calls for plenary review. According to the defendant, this court "must decide whether the trial court applied the appropriate legal standard . . . [and] because the material facts are not disputed, the application of the facts to the proper legal standard is also a question of law." (Citation omitted.) Specifically, the defendant contends that it owned the electrical components, and the court failed to recognize that those components were trade fixtures. Thus, it argues, the court committed error as a matter of law.[17] We disagree that the defendant's claim merits plenary review because the central issues of its claim are based on the court's factual findings that the electrical components were fixtures and that the defendant intended to deprive the plaintiff of its property, which are questions of fact.

"The question as to whether a particular piece of property is personalty or a fixture is a question of fact. *Vallerie* v. *Stonington*, 253 Conn. 371, 372–73, 751 A.2d 829 (2000); *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 217, 477 A.2d

988 (1984)] . . . . As such, our review . . . of this determination by the trial court is limited to deciding whether the findings of the trial court were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 268 Conn. 463, 479, 845 A.2d 389 (2004).

"[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . It is not our function to retry cases." (Citation omitted; internal quotation marks omitted.) *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 217.

We are also guided by the following long-standing principles of law relevant to the defendant's claim. "To constitute a fixture, we must look at the character of how the personalty was attached to real estate, the nature and adaptation of the [personalty] to the uses and purposes to which they were appropriated at the time the annexation was made, and whether the annexer intended to make a permanent accession to the realty. . . . The character of the personal property attached to the real estate is determined at the time that the property is attached to the real estate." (Internal quotation marks omitted.) *ATC Partnership* v. *Windham*, supra, 268 Conn. 479–80; see also *Merritt-Chapman & Scott Corp.* v. *Mauro*, 171 Conn. 177, 182, 368 A.2d 44 (1976); *Capen* v. *Peckham*, 35 Conn. 88, 93–94 (1868).

This "test focuses on the objectively manifested intent of the annexer. . . . Ordinarily, if not invariably, the character of personal property attached to realty is to be determined as of the date when the property is attached. . . . The intent sought is not the subjective intent or undisclosed purpose of the annexer, but the intent manifested by his actions." (Citations omitted; internal quotation marks omitted.) *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 216; *Lesser* v. *Bridgeport-City Trust Co.*, 124 Conn. 59, 64, 198 A. 252 (1938) ("owner of the equity is presumed to make improvements for the permanent benefit of the property, while a mere tenant is more likely to make them for his personal convenience"); *Webb* v. *New Haven Theatre Co.*, 87 Conn. 129, 133, 87

A. 274 (1913) ("whether [articles become] fixtures or [remain] personal property is to be determined largely by the intention with which they were attached, as indicated by all the facts in the case"); *Radican* v. *Hughes*, 86 Conn. 536, 542, 86 A. 220 (1913) ("[i]n cases of this kind every fact and circumstance should be considered which tends to show what intention is properly imputable to him who located the article in position"). "We have previously indicated that the narrow question of intent is a question of fact, the determination of which is not reviewable unless the conclusion drawn by the trier is one which cannot reasonably be reached." (Internal quotation marks omitted.) *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 216–17.

Moreover, trade fixtures are distinguished from fixtures. A fixture installed by a tenant may be deemed a trade fixture if it is "used . . . in connection with its business . . . [and] without intention that [the fixtures] become a part of the real estate and could . . . [be] removed without serious injury to the real estate." (Internal quotation marks omitted.) *Slosberg* v. *Callahan Oil Co.*, 125 Conn. 651, 653, 7 A.2d 853 (1939); see also *Griffith* v. *Drew's LLC*, 290 Neb. 508, 518, 860 N.W.2d 749 (2015) ("[t]rade fixtures are articles annexed to the realty by a tenant for the purpose of carrying on trade and are ordinarily removable by [the tenant] during [the tenant's] term"); 36A C.J.S. 316, Fixtures § 37 (2014) ("to qualify as [a] trade fixture . . . [it] must be annexed by a tenant to enable the tenant to carry on the trade or business to which the real property is devoted, and must be removable without material alteration or substantial damage to the real property to which it has been affixed" [footnote omitted]); 35A Am. Jur. 2d 706–707, Fixtures § 33 (2010) ("a trade fixture can generally be defined as those items of personal property annexed to the land by a tenant for purposes of carrying on a trade or business"); id., p. 707 ("The doctrine of trade fixtures is limited in its application to situations in which a landlord and tenant relationship exists, and is not applicable in [a] case in which the owner of land attaches fixtures to realty. An upgraded electrical system installed in a manufacturing facility by the seller of a building at the time the seller was the fee simple owner of the facility thus is not a trade fixture." [Footnote omitted.]).

Turning to law relevant to a statutory theft claim, "[w]e consistently have held that [s]tatutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . A person commits larceny within the meaning of . . . § 53a-119 when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. An owner is defined, for purposes of § 53a-119, as any person who has a right to possession superior to that

of a taker, obtainer or withholder. . . . [S]tatutory theft requires an intent to deprive another of his property . . . . Therefore, statutory theft requires a plaintiff to prove the additional element of intent . . . ." (Citations omitted; internal quotation marks omitted.) *Rana* v. *Terdjanian*, 136 Conn. App. 99, 113–14, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d 886 (2012). "Intent may be inferred by the fact finder from the conduct of the defendant." *State* v. *Kimber*, 48 Conn. App. 234, 240, 709 A.2d 570, cert. denied, 245 Conn. 902, 719 A.2d 1164 (1998). We iterate that "[i]t is well established that the question of intent is purely a question of fact. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the [defendant's] state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as . . . the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *Valencis* v. *Nyberg*, 160 Conn. App. 777, 793, 125 A.3d 1026 (2015). Finally, the appropriate standard of proof for claims brought pursuant to § 52-564 is the preponderance of the evidence standard. *Stuart* v. *Stuart*, 297 Conn. 26, 44, 996 A.2d 259 (2010).

On appeal, the defendant claims that the court erroneously concluded that it had committed statutory theft. The foundation of this claim is the defendant's assertion that it is the proper owner of the electrical components. From the defendant's perspective, Pye & Hogan bought the machinery and the electrical components as a "bundle" to continue with the business. Thus, the defendant contends that, because Pye & Hogan was the tenant in the property when the machinery and the electrical components were installed to continue the business, the electrical components became trade fixtures.

Moreover, the defendant relies on the agreement to support its ownership claim. Specifically, it points out that the electrical components were not listed as excluded assets. The defendant also directs our attention to § 2.1 (a) (ii) of the agreement to claim that it "acquired property *not* identified in the schedule, including the *fixtures . . . equipment . . . tools*, *supplies, spare parts . . . used by* [*Pye & Hogan*] *in connection with the conduct of the business*." (Emphasis in original.) To summarize the defendant's argument, Pye & Hogan was the original owner of the electrical components, and the electrical components became trade fixtures when Pye & Hogan installed them in the property. Because they were not part of the excluded list and the defendant bought the machines (which came as a "bundle" with the electrical components) for the purpose of operating this particular business, the defendant is the rightful owner of the electrical components. Therefore, the defendant claims, the court erro-

neously concluded that it had committed statutory theft because the court "ignored centuries of legal precedent making the distinction between 'fixtures' and 'trade fixtures'—the latter of which were undisputedly owned by the tenant." We are not persuaded.

We conclude that the court's memorandum of decision adequately supports its conclusion that the electrical components were fixtures. The court explicitly found that in 1990 the electrical distribution system, which included the bus ducts and branch feeders,[18] was installed in the property at a time when Donald owned the property. It also found that in 2001, the Woods family conveyed its interest in the property to the plaintiff through a quitclaim deed. Since 2001, the plaintiff, as the owner of the property, owned the electrical distribution system. The logical finding is that Donald, whom the court implicitly found to be the sole owner of the property in 1990, owned the electrical components when he installed them, and the evidence produced at trial supports this implicit finding. See *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 300–301, 685 A.2d 305 (1996) (concluding trial court's implicit factual finding not clearly erroneous); *Rene Dry Wall Co.* v. *Strawberry Hill Associates*, 182 Conn. 568, 575, 438 A.2d 774 (1980) (although trial court did not make explicit finding of reasonableness, such conclusion was implicit in findings and supported by testimony). Jeffrey testified at trial that Donald bought the machinery and the electrical components in 1989. Although the defendant vigorously denounces this testimony as "self-serving [and] conclusory," the issue of whether the witness was credible is not for this court to determine. See *Jay* v. *A & A Ventures, LLC*, 118 Conn. App. 506, 518, 984 A.2d 784 (2009) ("[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony" [internal quotation marks omitted]). Establishing that the court implicitly found that Donald was the sole owner the electrical components in 1990 does not end the analysis.

The court also found that, prior to 2005, Pye & Hogan rented the property to manufacture aircraft engine components. Although not explicit, it is clear that the court reasoned that when Donald installed the electrical distribution system, including the electrical components, it was annexed to the property to manufacture aircraft engine components. The evidence presented at trial also supports this finding, and the defendant agrees as much: "[F]rom 1989 to 2001, there is no dispute that the [electrical components][19] were used by [Pye & Hogan] to operate the business . . . ." (Footnote added.) Thus, the electrical components were specifically adapted to the property for the purpose of manufacturing aircraft engine components, and the court's finding is supported by testimonial evidence. Jeffrey testified that without the electrical components, the property became "no

more than just a warehouse as opposed to being an industrial manufacturing building." Further, the court's finding relating to the character of the annexation, which was that the bus ducts were attached by bolts to the electrical conduits, when viewed in light of the court's concomitant finding that the electrical components were necessary to manufacture aircraft engine components, militates in favor of finding that the electrical components were fixtures. We now turn our attention to the court's finding regarding the intent of the annexer.

The court explicitly found that "[the plaintiff] intended the [electrical components] to be fixtures." Although this finding is clearly erroneous because the court found previously that the electrical components were installed in 1990, and undisputed evidence established that the plaintiff did not come into legal existence until approximately ten years later,[20] it is harmless error. "Where . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 281, 976 A.2d 750 (2009). We conclude that the court's finding as to the plaintiff's intent was harmless and does not undermine the court's conclusion that the electrical components were fixtures.

In light of all the circumstances of this case, the court correctly determined that the electrical components were fixtures. After the original manufacturing building was destroyed by fire in 1989, a new manufacturing facility was built to allow Pye & Hogan to continue with its business. Because Donald, as implicitly found by the court, was the owner of the electrical components when he installed them in 1990, his installation created a presumption that Donald was making "improvements for the permanent benefit"; *Lesser* v. *Bridgeport-City Trust Co.*, supra, 124 Conn. 64; of the newly constructed manufacturing facility. Acts subsequent to the installation of the electrical components confirm Donald's intent that the electrical components were fixtures.

From 1990 onward, the property was used by Pye & Hogan to manufacture aircraft engine components. As Jeffrey explained, the machinery used to make these items required a "higher demand for energy," which required arrangements with the electric company for "higher-end wiring to come in the building" for the bus ducts. It is also noteworthy that, according to Jeffrey, the building without the electrical components was no longer suitable to manufacture "machine and fabricated precision components for gas turbine engines used in

military, commercial and industrial applications," but was "now no more than just a warehouse . . . ." See *Webb* v. *New Haven Theatre Co.*, supra, 87 Conn. 133 (providing that whether articles were "so attached to the building as to make them useful in connection with [the building], and so that their removal would render [the building] practically useless for the purpose for which [the building] was constructed and used" was "[an] important, but not conclusive, [fact] as tending to show the intention with which [the articles] were attached"). Taken together, the facts and circumstances of this case, namely, that, in 1990, Donald installed the electrical components in the newly constructed facility to manufacture aircraft engine components, are sufficient to confirm Donald's intention that the electrical components were to remain fixtures.

We also find support in *ATC Partnership* v. *Windham*, supra, 268 Conn. 463. In that case, our Supreme Court was presented with the issue of whether certain fixtures had been "severed from the underlying realty and thereby revert[ed] back to the status of personalty." Id., 480. Relevant to our analysis in the present case, the court in *ATC Partnership* explained: "With regard to the potential progression of property from fixture to personalty, the general rule is that such severance may be either actual, in the sense of physical separation from the realty and removal from the land, or constructive, as in a situation in which a party objectively manifests its consideration of property as personalty . . . *or in which parties agree as between themselves to consider a fixture as personalty.*" (Citation omitted; emphasis added.) Id.

Here, the court found that in 2005, Pye & Hogan, which did not own the property, sold its personal property to the defendant. The court also found that the agreement established that Pye & Hogan leased certain real property, which had adequate electrical distribution and service facilities, and the agreement delineated the personal property that was to be sold, which did not include the electrical distribution system or the electrical components. Pursuant to the lease, the defendant could remove only equipment it had purchased or installed at its own cost. The court found that the defendant had not installed the bus ducts. Therefore, at a minimum, the court implicitly found that the parties did not agree as between themselves to consider the electrical components as personalty. After a thorough examination of the record and the court's other findings, our confidence in the court's fact-finding process is not undermined by its erroneous finding that the plaintiff intended the electrical components to be fixtures;[21] accordingly, we conclude that the court's erroneous finding was harmless and does not undermine the court's finding that the electrical components were fixtures.[22]

Having established that it was not clear error for the court to find that the electrical components were fixtures, we address the court's conclusion that the defendant had committed statutory theft. The court inferred that the defendant intended to deprive the plaintiff of its property from the defendant's "actions in changing the locks on the property," which prevented the plaintiff from "[seeing the defendant] improperly removing items of the electrical distribution system, combined with its actual knowledge that [the plaintiff] claimed ownership of those items . . . ." Also, the court found that the defendant had removed and installed the electrical components in its new manufacturing building, where it relocated after vacating the premises, despite knowing that the plaintiff disputed ownership of the components. On the basis of the circumstantial evidence before the court, we conclude that the relevant facts set out in the memorandum of decision pertinent to the court's finding that the defendant intended to deprive the plaintiff of its property are supported by the evidence. Accordingly, the court's legal conclusion that the defendant committed statutory theft is legally and logically correct.[23]

B

The defendant also claims that, in the alternative, the court erroneously concluded that it had committed statutory theft because the defendant had a good faith belief that it owned the electrical components. We do not agree.

We first set forth the law relevant to this claim and our standard of review. Because statutory theft is synonymous with larceny; *Rana* v. *Terdjanian*, supra, 136 Conn. App. 113; a good faith belief that one owns the property at issue will negate the required intent. "One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking. . . . The general rule applies . . . to one who takes it with the honest belief that he has the right to do so under a contract . . . ." (Internal quotation marks omitted.) *State* v. *Papandrea*, 120 Conn. App. 224, 231, 991 A.2d 617 (2010), aff'd, 302 Conn. 340, 26 A.3d 75 (2011). The burden was on the defendant to establish that it had good faith belief that it owned the electrical components. See *State* v. *Varszegi*, 33 Conn. App. 368, 373, 635 A.2d 816 (1993) ("A defendant who acts under the subjective belief that he or she has a lawful claim on property lacks the required felonious intent to steal. Such a defendant need not show his mistaken claim of right was reasonable, since an unreasonable belief that he had a right to take another's property will suffice *so long as he can establish his claim was made in good faith*." [Emphasis added; internal quotation marks omitted.]), cert. denied, 228 Conn.

921, 636 A.2d 851 (1994).

Our Supreme Court has stated that "the term good faith has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. . . . It has been well defined as meaning [a]n honest intention to abstain from taking an unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious. . . . It is a subjective standard of honesty of fact in the conduct or transaction concerned, taking into account the person's state of mind, actual knowledge and motives. . . . Whether good faith exists is a question of fact to be determined from all the circumstances." (Citation omitted; internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 412–13, 948 A.2d 1009 (2008). Accordingly, we apply the clearly erroneous standard to the court's fact-finding.

"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 11–12, 807 A.2d 991 (2002).

Moreover, because the lease was a contract; see *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007); as was the asset purchase agreement; see *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 285–86 (treating purchase and sale agreement as contract); both are subject to the same rules of construction as other contracts. Therefore, "[o]ur resolution of the [defendant's] claim is guided by the general principles governing the construction of contracts. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omit-

ted.) *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 8.

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670–71, 791 A.2d 546 (2002).

Where the contract language is not definitive, the determination of the parties' intent is a question of fact, and the court's interpretation is subject to reversal on appeal only if it is clearly erroneous. *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 357, 727 A.2d 1260 (1999). Furthermore, because the court did not rely solely on the agreement and the lease but resorted to taking into account the surrounding circumstances, we apply the clearly erroneous standard. See *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 9.

The defendant advances three arguments to support its claim that it had a good faith belief that it owned the electrical components. First, the defendant asserts that Pye & Hogan bought those electrical components and the machinery as a "bundle." Thus, pursuant to the agreement, it purchased Pye & Hogan's "assets necessary for the business . . . ." The defendant also points out that the electrical components were not listed as excluded assets. Second, the defendant claims that the lease supports it claim of ownership because it, as the tenant, could remove trade fixtures that were installed prior to the formation of the lease. Third, the defendant contends that there was no direct evidence that it intended to steal the electrical components. Therefore, the defendant asserts that the agreement, the lease, and the lack of direct evidence of an intent to commit statutory theft demonstrate that it had a good faith belief that it owned the electrical components. We are not persuaded.

We first examine the agreement. From the outset, the agreement stated that "[Pye & Hogan] is a leading manufacturer of machine and fabricated precision com-

ponents for gas turbine engines used in military, commercial and industrial applications, including aircraft, helicopters and tanks (the '[b]usiness')." Section 2.1 (a) (ii) of the agreement stated, in relevant part, that Pye & Hogan, as the seller, was selling its personal property as "described in Schedule 2.1 (a) (ii), together with the fixtures, furnishings, furniture, equipment . . . supplies, spare parts . . . wherever located, or acquired by [Pye & Hogan] in connection with the conduct of the [b]usiness . . . ." (Emphasis in original.) Section 2.2 (d) provided that "all assets in possession of [Pye & Hogan] but owned by third parties including, without limitation, those assets listed on Schedule 2.2 (d) . . . ." (Emphasis in original.) The agreement did not itemize the electrical components as personal property to be sold to the defendant, and the components were not listed as excluded assets. Although the agreement clearly stated that the property, which was only leased by Pye & Hogan, had an adequate electrical distribution system, it did not define what constituted the electrical distribution system.

We now turn our attention to the lease. Paragraph 15 of the lease provided, in relevant part, "[a]ny and all alterations, additions and improvements, which may be made or installed by either [the plaintiff] or [the defendant] upon the [property] and which in any manner are attached to the floors, walls or ceilings . . . such that their removal will damage the [property], shall remain upon the [property] . . . . However, the usual trade fixtures . . . which may be installed in the [property] prior to or during the term hereof at the cost of [the defendant] may be removed by [the defendant] from the [property] upon the termination of this [l]ease. Further, [the defendant] covenants and agrees, at its own cost and expense, to repair any and all damage to the [property] resulting from or caused by such removal." The electrical components were not explicitly listed as "alterations, additions and improvements," or explicitly excluded from being considered trade fixtures.

In reviewing relevant portions of the agreement and the lease, the court did not explicitly indicate whether the documents contained any ambiguity. In its finding, however, that under both the agreement and the lease "the electrical distribution system was described as belonging to the landlord, [the plaintiff]," the court resorted to looking at evidence beyond those documents.

First, the court found that the agreement did not include the electrical distribution system as an asset to be sold to the defendant. From the outset of its memorandum of decision, the court found that the electrical distribution system consisted of the bus ducts and the branch feeders.[24] The court also relied on the relevant language of the agreement in which Pye &

Hogan, as the lessee, represented to the defendant that the property had an adequate electrical distribution system to conclude that the agreement did not provide for the electrical components to be sold to the defendant. The court found that Donald, in 1990, installed the electrical distribution system in the property. The court also found that since 2001 when the Woods family quitclaimed its interest in the property, the plaintiff was the owner of the electrical distribution system. Thus, according to the court's reasoning, because Pye & Hogan did not own the property, it could not have sold any part of the electrical distribution system to the defendant. To buttress further this determination, the court noted that the electrical distribution system, including the bus ducts and branch feeders, as well as the transformer, were not listed as assets to be sold. Evidence presented at trial supported these findings.

Jeffrey testified that the electrical components were not part of the transaction and were intended to be permanently affixed to the property. Furthermore, at trial, two personal property declaration forms were admitted as full exhibits showing that the electrical components were not listed as personal property by either Pye & Hogan or the defendant.[25] A reasonable inference from those exhibits is that the electrical components were not personal property to be sold pursuant to the agreement. Accordingly, there was both testimonial and documentary evidence to sustain the court's finding that the agreement did not support the defendant's good faith belief claim.

Second, the court found that, although the lease allowed the defendant to remove equipment that it had purchased or installed, the defendant had not installed the electrical bus ducts. The evidence at trial, namely, that Donald purchased and installed the electrical distribution system, supported this finding. See also part I A of this opinion where we conclude that the court implicitly found that Donald purchased the electrical components. Thus, the lease does not corroborate the defendant's good faith belief claim. Accordingly, we reject the defendant's argument that the agreement and the lease were evidence that reasonably supported a finding that it had a good faith belief that it owned the electrical components.

The court also found that the defendant's knowledge that the plaintiff disputed the defendant's ownership claim was a surrounding circumstance that undermined the defendant's good faith belief claim. Specifically, the court found that "[k]nowing that [the plaintiff] claimed ownership of the electrical distribution system, and lacking any support for its claim of ownership in either the lease or the [agreement], [the defendant] could have left the bus duct, branch feeders and transformer in place until a court could determine ownership." Evidence presented at trial supported the court's finding

that ownership was disputed. The court found that the plaintiff, when notified of the defendant's impending departure, had sent the defendant a letter "clearly stat[ing] that the defendant was to refrain from removing various items from the property," which included the bus duct and " 'electrical conduit' . . . ." Thus, the defendant's knowledge that the plaintiff claimed ownership of the electrical components undercuts its good faith belief that it owned the electrical components.[26]

The defendant's conduct was another surrounding circumstance found by the court that weakened the defendant's good faith belief argument. Specifically, the court found it significant that the defendant, although knowing that the plaintiff disputed ownership of the electrical components, prevented the plaintiff from accessing the property by changing the locks. his conduct did not demonstrate a "state of mind denoting honesty of purpose . . . ." (Internal quotation marks omitted.) *Bhatia* v. *Debek*, supra, 287 Conn. 412. Furthermore, the court, "taking into account the person's state of mind, actual knowledge and *motives*"; (emphasis added; internal quotation marks omitted) id., 413; stated that evidence was presented suggesting that the defendant took the electrical components to "[make] it more expensive and, therefore, difficult for the Woods [family] to compete."[27] Viewed holistically, the evidence presented at trial supports the court's finding that the defendant did not have an honest belief that it had the right to remove the electrical components under either the agreement or the lease.

Contrary to the defendant's assertion, direct evidence that it intended to steal the electrical components was not required. We iterate that "[w]hether good faith exists is a question of fact to be *determined from all the circumstances*." (Emphasis added; internal quotation marks omitted.) *Bhatia* v. *Debek*, supra, 287 Conn. 413. We are also mindful that "[w]e cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 11. We conclude that the court, in evaluating all the circumstances underlying the defendant's good faith belief claim, made findings that were supported by the evidence, and the defendant failed to establish its good faith belief that it owned the electrical components. Accordingly, the court was not clearly erroneous in its determination.

II

The defendant next claims that the court erred in its interpretation of the lease. Specifically, it argues that the court incorrectly concluded that the rent was based on a flat rate and not on square footage. We disagree.

The record reveals the following additional relevant facts. The lease provided that the defendant would pay the plaintiff $17,000 per month to rent 32,930 square

feet of the property. This amount of space, according to the lease, represented 87.25 percent of the "rentable square feet of . . . the [b]uilding," which was defined as the " '[t]enant's [p]roportionate [s]hare' . . . ." Pursuant to the lease, the defendant was to pay the plaintiff a proportionate share of the expenses associated with the property's cost and maintenance charges.

Sometime in 2008, Bromley, who at that time was negotiating with Donald and Jeffrey to purchase the property, discovered that the actual square footage was approximately 7000 square feet fewer than what was stated in the lease. At trial, Jeffrey testified that he had "transposed numbers" from information that he had obtained from a drawing of the building; consequently, Jeffrey made a "mistake in calculating up the square footage."

Attorney John J. Palmeri, an attorney for the plaintiff, testified that the lease was originally drafted by the defendant's Texas based law firm. The lease underwent nine drafts, with the tenth draft as the final version. Importantly, Palmeri testified that from the first version of the lease, the $17,000 per month rent was a flat rate, and not once had the defendant's attorney requested a rate based on square footage. Palmeri further testified that the square footage of the property was relevant only in the negotiations to determine the cost and maintenance charges. Finally, Palmeri testified that in the event that the defendant rented additional space within the property, the lease provided a mechanism by which the new rent would be calculated.

Bromley, however, testified that the lease was based on a square foot rate. Specifically, he testified that the square footage was "[a]bsolutely fundamental . . . [b]ecause [he] was assessing the pricing of the square footage . . . ." After testifying that he would in "no way . . . sign the lease without the absolute certainty that the . . . square footage on that lease was properly represented," the court questioned him on whether he measured the facility once he took possession of it. Bromley stated that he measured the property when he was considering buying it.

The court found that the rent was a flat rate of $17,000 per month. It based this finding on various subordinate findings. First, the defendant's counsel provided the original draft of the lease, which underwent nine additional drafts. Second, the court credited Palmeri's testimony that "the accuracy of the square footage . . . only came up in the context of the cost and maintenance . . . charges." Third, the court did not find Bromley's testimony credible. Specifically, it did not find his claim that the square footage was "[a]bsolutely fundamental" as persuasive because Bromley did not verify the square footage upon occupying the property. The court found that it was only when the "parties' positions became adversarial" that the issue of the square footage, as it

related to the rent, become an issue.

To resolve this claim, we are "guided by the general principles governing the construction of contracts"; (internal quotation marks omitted) *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 8; as set forth in part I B of this opinion.

"When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct . . . . Under the circumstances of this case, because the trial court did not rely solely on the written agreement but took into account the surrounding circumstances, we apply the clearly erroneous standard to the court's fact-finding." (Citations omitted; internal quotation marks omitted.) Id., 9.

On appeal, the defendant contends that the court committed error by not finding that the rent was based on square footage. It argues that the plain and unambiguous language of the lease necessitates this finding. Specifically, the defendant asserts that when interpreting the lease as a whole, the language of the lease proves that the rent was "based upon a dollar per square foot [method]." The defendant focuses our attention to particular provisions of the lease that define the rent, that discuss the defendant's obligation to pay a proportionate share of operating expenses, and that establish the defendant's preferential right to lease additional space. We are not persuaded.

We first examine the lease. Paragraph 2 provided, in relevant part, that "[t]he annual rent payable during the [i]nitial [t]erm hereof ('*Rent*') shall be payable in twelve . . . equal monthly installments in the amount of [$17,000] per month . . . ." (Emphasis in original.) Paragraph 6 provided that the defendant would pay "additional rent" to the plaintiff to cover variable expenses, which included a share of the real estate taxes, insurance, and operating expenses of the property subject to the lease. For example, paragraph 6 (d) provided in relevant part that "[the defendant] shall pay to [the plaintiff], during each month of the term of the [l]ease, as *additional rent*, an amount equal to [t]enant's [p]roportionate [s]hare of [the plaintiff's] actual, reasonable operating expenses with respect to the operation, repair and maintenance of the [property] and/or on the land on which the [property] is located." (Emphasis added.) The term "additional rent" was repeated in various paragraphs of the lease, and in one paragraph, it was juxtaposed as follows: "The [defendant] covenants with the [plaintiff] to hire said [d]emised [p]remises and to pay Rent and additional rent . . . ." Finally, paragraph 40 provided in relevant part that "[the defendant] shall have the exclusive right . . . to lease any other space in the [property] as it comes available upon the same terms and conditions as those in this [l]ease, including Rent at the same rate per square foot being

charged at that time hereunder for the additional rentable square footage added to the [d]emised [p]remises; and an increase in the [t]enant's [p]roportionate [s]hare for the additional rentable square footage added to the [d]emised [p]remises."

It is clear that the lease did not explicitly state that the rent, i.e., $17,000 per month, was based on a flat fee. The term "Rent" was defined, but the lease did not define the term "additional rent." The lease, however, did treat the terms differently, which implies that the parties intended to treat them as separate and unrelated obligations. It is also clear from the preferential right to lease provision, i.e., paragraph 40, that, if the defendant chose, it could lease additional space, and the provision provided a method to calculate the new monthly rent. The term "including Rent at the same rate per square foot" in paragraph 40, however, created ambiguity. Because of the ambiguity in the lease, it is clear that the court had to resort to examining the surrounding circumstances to determine the intent of the parties on whether the rent was based on a flat rate or on square footage.

One of the surrounding circumstances that the court found persuasive was that in drafting the lease, the square footage became relevant only in determining the cost and maintenance charges. This finding was supported by Palmeri's testimony. The court did not credit Bromley's testimony that he relied on the square footage as stated in the lease to negotiate the rent. Because the credibility of witnesses is not for us to decide, we will not question the court's credibility determination of Palmeri and Bromley's testimony. See *Jay* v. *A & A Ventures, LLC*, supra, 118 Conn. App. 518. On the basis of the testimony and other evidence adduced at trial, the court found that the square footage issue only presented itself when the parties' positions became adversarial.

"The standard of review with respect to a court's findings of fact is the clearly erroneous standard. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 11–12. We conclude that the court's factual findings are not clearly erroneous in light of the evidence and the record. There is evidence to support all of the court's findings and, after review, we are not left with the definite and firm conviction that a mistake has

been made.

### III

The defendant's final claim is that the court misapplied a legal standard in deciding the defendant's constructive eviction claim. Specifically, it argues that the court's determination that the defendant was not constructively evicted was based on a "misapplication and overly expansive reading of the 'substantial interference' test that applies to constructive eviction claims." The defendant is mistaken.

The following additional facts, as set forth by the court, are necessary to resolve this claim. Sometime in 2008, Bromley began to negotiate the purchase of a property in Chester. In July, 2009, the defendant received a draft of a lease for the Chester property, and during the following month, the defendant hired an electrician to do "electrical work connected" with the defendant's relocation to Chester.

Ultimately, the court determined that the defendant could not prevail on its counterclaim. Specifically, the court determined that the defendant's argument that a "water/flooding problem forced" it to vacate was not credible. The court noted that the defendant was "never required to cease operations due to water intrusion or a nonfunctioning toilet." Also, it noted that the defendant, up until December, 2009, "paid the monthly rent and manufactured its product." It also found that as of July, 2009, the defendant was "actively negotiating to move its operations to Chester . . . ." As to the defendant's claim that it was forced to vacate the property because Donald threatened its employees, the court also did not determine this to be credible. The court found that the defendant did not vacate the property because of water problems or Donald's alleged threats; rather, it found that the defendant left the property "because it had planned the move for at least six months. The constructive eviction claims had been asserted in an effort to avoid paying amounts due under the balance of the lease term."

The defendant argues that this claim merits plenary review. Specifically, it contends that the court should have applied a so-called "substantial interference test" to its constructive eviction claim. For support, the defendant relies on *Conference Center Ltd.* v. *TRC*, 189 Conn. 212, 455 A.2d 857 (1983). In that case, the issue before our Supreme Court was "whether a tenant ha[d] been constructively evicted when served with a demand for immediate possession by a mortgagee initiating foreclosure proceedings against the tenant's landlord." Id., 213. To resolve this issue, our Supreme Court took into "account of three convergent areas of the law," namely, mortgage law, landlord-tenant law, and commercial law. Id., 218. In doing so, the court in *Conference Center Ltd.*, after noting that it had done so in the past, "looked

to operative principles contained in the Uniform Commercial Code for a source of law that informs real property transactions as well as sale of goods transactions." Id., 225. It was in this context that our Supreme Court "look[ed] to Uniform Commercial Code § 2-609 for assistance in determining whether there ha[d] been that substantial interference with possession or enjoyment which is the essence of constructive eviction." Id. Far from creating a new test for a constructive eviction claim, our Supreme Court mentioned this term only once in its seventeen page opinion. The vastly divergent issues between *Conference Center Ltd.*, and this case, along with the context in which the term "substantial interference" was used, demonstrates the flaw in the defendant's argument in seeking plenary review.

"[A] constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent. . . . In addition to proving that the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord, (2) *the tenant vacated the premises because of the problem*, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem. . . . That factual determination will not be disturbed by [a reviewing] court unless the conclusion is such that it could not reasonably be reached by the trier. . . . It is necessary therefore, to review the court's findings along with the factual record to determine whether the court properly found that the defendant was constructively evicted." (Citations omitted; emphasis added; internal quotation marks omitted.) *Welsch* v. *Groat*, 95 Conn. App. 658, 662–63, 897 A.2d 710 (2006).

On appeal, the defendant claims that the court failed to apply the so-called "substantial interference test." Indeed, it takes issue with the court for not referencing "any case law regarding constructive eviction." The defendant's argument is unavailing.

Although the defendant is correct that the court did not explicitly cite case law relevant to a constructive eviction claim, as noted previously, however, "[a]bsent a record that demonstrates that the trial court's reasoning was in error, we presume that the trial court correctly analyzed the law and the facts in rendering its judgment." (Internal quotation marks omitted.) *Roberson* v. *Aubin*, 120 Conn. App. 72, 75–76, 990 A.2d 1239 (2010); see also footnote 21 of this opinion. The court did find that the defendant failed to prove that it vacated the property because of either water problems or Donald's alleged threats; see *Welsch* v. *Groat*, supra, 95 Conn. App. 662 ("a party pleading constructive eviction *must prove* that . . . [inter alia] the tenant vacated the

premises because of the problem" [emphasis added; internal quotation marks omitted]).

The court found that the water problems were not the reason that the defendant vacated the property. The court had the opportunity to evaluate the testimony of three witnesses who were employed formerly by the defendant. Two of the former employees testified that the alleged water problem and toilet issue were insignificant. The third former employee testified that the water intrusion was not that problematic.[28] Moreover, the court had a copy of the Chester facility lease, signed on October 30, 2009, which was introduced as a full exhibit, and testimony from the electrician who the defendant hired well before it vacated the property to support its finding that the defendant vacated the premises "because it had planned the move for at least six months."

The court also determined that the defendant's claim that Donald's alleged threats forced it to vacate the property was not credible. This determination was supported by the court's evaluation of testimonial evidence. An employee of the defendant testified that he heard Donald, on separate occasions, threaten two other employees, Scott Lawton and Andrew Gibson. Neither of the employees who were allegedly threatened testified. The court was presented, however, with testimony from a "neutral witness," Richard Kuskoski. He testified to being only present when Donald allegedly threatened Gibson. Kuskoski testified that he did not see or hear Donald threaten Gibson.

"As noted previously, [appellate courts] . . . may not retry a case. . . . The [fact-finding] function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Appellate review of a factual finding, therefore, is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court." (Internal quotation marks omitted.) *Welsch* v. *Groat*, supra, 95 Conn. App. 666.

We conclude that it was not unreasonable for the court, in light of the full record, to draw the inference that the defendant vacated the premises because it had been planning to do so for six months. "As we have often stated, [i]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts

in hand, to the end that their action may be intelligent and their conclusions correct." (Citation omitted; internal quotation marks omitted.) Id., 666–67. The court drew a reasonable inference on the basis of the testimony and other evidence offered at trial. Accordingly, we determine that the court's findings are supported adequately by the record. We conclude, therefore, that the court properly found that the defendant was not constructively evicted.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The original complaint was filed on December 14, 2009, alleging in a single count that the defendant had committed statutory theft.

[2] The plaintiff's amended complaint had also sought replevin and equitable relief. As to the plaintiff's replevin claim, the court considered it abandoned because it was argued as an alternative to the statutory theft claim. As to the equitable relief claim, the court found in favor of the defendant because the plaintiff was being "adequately compensate[d] . . . for the breaches and wrongs [done] by [the defendant], and there is no need to impose any additional equitable remedy."

The four other counts of the defendant's counterclaim sounded in fraudulent misrepresentation, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

[3] That same year, Donald leased the property to Pye & Hogan Machine Company, Inc., a company that manufactured "aircraft engine components for the small- to medium-size gas turbine aerospace market."

[4] In general terms, a bus duct is "an electric conduit prefabricated in sections and containing heavy conductors for transmission of large currents at relatively low voltage." Webster's Third New International Dictionary (2002).

[5] At trial, the plaintiff's expert, referencing a photograph admitted into evidence (exhibit 11), testified that individual branch feeders were connected onto a "disconnect head," which was itself attached to a bus duct, and onto an individual machine.

[6] Prior to the creation of the plaintiff, Donald transferred part of his ownership interest in the property to his two children.

[7] The defendant submitted as a full exhibit a letter detailing its reasons for leaving the property before the end of the lease. The court, in its memorandum of decision, quoted from this letter.

[8] We note that the court's memorandum of decision misstated that the defendant sought the injunction. The record shows that, in denying the plaintiff ex parte temporary injunctive relief, the court, *Bear*, *J.*, on December, 14, 2009, also ordered the defendant summoned to show cause why the temporary injunction should not be issued. The show cause hearing never occurred.

[9] The defendant acknowledged, in its main brief, that when it vacated the property, it took with it the branch feeders and the transformer.

[10] Lamb was an electrical contractor and licensed electrician with approximately forty-four years of experience.

[11] According to Lamb, replacing the bus ducts would cost $110,000, the branch feeders would cost $66,300, and the transformer would cost $5000.

[12] General Statutes § 52-564 provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[13] This award represented treble damages permitted under the statute, i.e., $181,300, the cost to replace the items, multiplied by three.

[14] The court calculated this award by adding $85,000 of rent owed for the last five months of the lease, $85,649.58 in cost and maintenance charges that the defendant never paid the plaintiff, $34,614.30 incurred by the plaintiff to repair the property after the defendant vacated it, and $47,987.58 in attorney's fees awarded to the plaintiff, which was permitted under the terms of the lease. The court then subtracted the $34,000 that the defendant had paid as a security deposit.

[15] The following relevant testimony was presented at trial:

"[Jeffrey]: Back in September of 1989, September 15th to be exact, our building burned down. . . . And on Saturday morning, September 16th, we

all convened and decided we were going to stay in business. At that time we knew of a business in New Jersey that had closed. Our sales manager, myself, my father and Steve Helmedach drove to New Jersey on Sunday, met with the general manager and got all the particular information, and then on Monday my father returned to New Jersey with his attorney and negotiated a deal to purchase all the assets and equipment from [a bankrupt company], or from bankruptcy, and made an offer with the Bankruptcy Court, as I understand it.

"[The Defendant's Counsel]: And that's how he came to own the, a new set of machinery for the business, right?

"[Jeffrey]: Yes.

***

"[The Defendant's Counsel]: Right. Okay. Fine. And as a result of that, all of the machines, all of the assets of the failed business were transported from New Jersey to Old Saybrook.

"[Jeffrey]: All of the equipment and electrical distribution."

[16] Jeffrey testified, in relevant part, on the first day of trial as follows:

"[The Plaintiff's Counsel]: And what is bus ducting or bus bar refer to?

"[Jeffrey]: It is referred to a permanent—permanently installed electrical system that would be utilized for the manufacturing—or for purposes of manufacturing products.

"[The Plaintiff's Counsel]: The machines that were used by [Pye & Hogan], did they have a—would they require a higher demand for energy than would be in a normal setting?

"[Jeffrey]: Yes.

"[The Plaintiff's Counsel]: And did—prior to [the plaintiff] owning [the property], who was the prior owner of [the property]?

"[Jeffrey]: The Woods family.

"[The Plaintiff's Counsel]: Okay. And while the Woods family—at what time was the electrical distribution system or bus ducting installed in the building?

"[Jeffrey]: Approximately spring of 1990.

"[The Plaintiff's Counsel]: Okay. And when the Woods family installed the bus ducting at the property, what was their intention with regard to the installation? Was that intended to be temporary or permanent?

"[Jeffrey]: That was intended to be permanent.

"[The Plaintiff's Counsel]: How was the bus ducting attached or incorporated to the building?

"[Jeffrey]: It was securely bolted to the ceiling, much along the lines of the air conditioning ducts and other components.

"[The Plaintiff's Counsel]: So, you stated similar other components of the building have been attached in a similar manner?

"[Jeffrey]: Yes.

"[The Plaintiff's Counsel]: The air conditioning ducts?

"[Jeffrey]: Air conditioning ducts, air lines.

"[The Plaintiff's Counsel]: Water lines?

"[Jeffrey]: Water lines.

"[The Plaintiff's Counsel]: To use this bus ducting system and for the high demand of the machines, did you have to make any other arrangements with the power supply from Connecticut Light & Power [Company]?

"[Jeffrey]: Yes, we needed higher-end wiring to come in the building."

[17] The defendant takes the court to task because, according to the defendant, the "court did not address the concept of trade fixtures whatsoever," and "failed to ask the critical question: whether [the electrical components] were trade fixtures." We note that the defendant did not file a motion for articulation. See Practice Book § 66-5. Therefore, "[a]bsent a record that demonstrates that the trial court's reasoning was in error, we presume that the trial court correctly analyzed the law and the facts in rendering its judgment." (Internal quotation marks omitted.) *Roberson* v. *Aubin*, 120 Conn. App. 72, 75–76, 990 A.2d 1239 (2010).

[18] The court did not explicitly find that the transformer was a component of the property's electrical distribution system. At trial, nonetheless, evidence was presented that the transformer was required for a machine to operate. Referencing exhibit 8, a photograph that depicted the transformer, Lamb testified, in relevant part, as follows with respect to the transformer: "This big machine needs a transformer because it's 480 on the prime, so this transformer is a buck-boost, they call it a buck-boost, with 208 coming in from [Connecticut Light & Power Company] to 480s, secondary, because that's what that machine needs, and that particular transformer, if it's the right [kilovolt-ampere], is averaging between [five]—well, you could be

talking [four], $5000, at least, just for the transformer that you need to bring that up to 480 volts."

[19] We note that the defendant, in its brief and at oral argument in this court, claims that the transformer was "portable." Nowhere in the record, however, was the transformer referred to as a "portable transformer." Nor does the defendant provide such a citation to the record.

[20] On the second day of trial, Jeffrey testified, in relevant part, as follows: "In approximately . . . 2000, my father started to transfer assets into my sister's and my name, which was first the business. And then, as well, created [the plaintiff] for all of the real property."

[21] We note that the defendant strenuously argues that the court committed a "series of cascading errors that flowed from [the] critical legal error" of failing to consider whether the electrical components were trade fixtures. The defendant could have attempted to assuage its dissatisfaction with the court's memorandum of decision through a motion to reargue. See Practice Book § 11-12; see also *Opoku* v. *Grant*, 63 Conn. App. 686, 692, 778 A.2d 981 (2001) ("[t]he purpose of a reargument is . . . to demonstrate to the court that there is . . . some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts" [internal quotation marks omitted]).

[22] We note that a Superior Court, under the facts of the case before it, found that bus ducts were fixtures. In *Darcey* v. *Atlas Hobbing & Tool Co.*, Superior Court, judicial district of Tolland, Docket No. CV-01-75889-S, 2002 WL 31002123, *1 (August 1, 2002), the court, *Sferrazza, J.*, found that a "[b]us duct [was] an electrical conduit which [was] affixed by screws to the exposed surface of the walls or ceilings and which provides the specialized electric power outlets commonly needed by industrial machinery." The court also found that "when the bus duct was installed by the defendant's predecessor . . . and later added to by the defendant, its purpose was to provide electric power to industrial machinery on a permanent . . . basis. . . . These items, installed with screws and wiring from the electrical panel box, were not equivalent to an extension cord or plug-in lamp. These items were hardwired and performed in situ for a period of years." (Citation omitted.) Id., *3. Because of these findings and the fact that the parties' lease agreement stipulated that fixtures installed by the defendant became the property of the plaintiff, the court ruled that the defendant in *Darcey* unlawfully removed the bus duct from the premises. Id., *3–4.

Although the defendant here cited an Ohio case in which a court held that a "bus-bar unit was not a fixture but was an item of equipment and personal property"; *GTR Land Co.* v. *Wilson Cabinet Co.*, Docket No. 386, 1988 WL 142305, *7 (Ohio App. December 30, 1988); that case is factually distinguishable. Unlike the present case, in *GTR Land Co.*, the defendant installed the "bus-bar unit." Id., *6.

[23] This conclusion negates the necessity to address fully the defendant's claim that the court's conclusion "regarding ownership of the [electrical components] [i]s contrary to Supreme Court precedent." Specifically, the defendant advances the proposition that "self-serving statements made long after the fact are insufficient to establish the necessary intent to establish that an item is a fixture." It attributes this proposition to our Supreme Court, citing *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 216–17, and to the Michigan Supreme Court, citing *Lord* v. *Detroit Savings Bank*, 132 Mich. 510, 511, 93 N.W. 1063 (1903). To be sure, the early twentieth century case from Michigan supports the defendant's claim. The case that binds this court, however, does not. In the portion of *Waterbury Petroleum Products, Inc.*, that was cited by the defendant, our Supreme Court made clear that the test to determine a fixture "focuses on the objectively manifested intent of the annexer." *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 216. Moreover, "[t]he intent sought is not the subjective intent or undisclosed purpose of the annexer, but the intent manifested by his actions." (Internal quotation marks omitted.) Id. We do not read the legal principles set forth by our Supreme Court as broadly as the defendant does, which is not to suggest that self-serving statements, standing alone, are sufficient to establish the intent of the annexer. In this case, the court was presented with testimony, which it was free to credit, and other evidence surrounding the circumstances of the installations of the electrical components that confirmed Donald's intention to make the electrical components fixtures when he installed them in 1990.

[24] With respect to the transformer, the court did not explicitly deem it a component of the electrical distribution system. This omission, nonetheless, is not significant in light of our conclusion that it was not clear error

for the court to find that the transformer was a fixture. See part I A of this opinion.

[25] At trial, Jeffrey testified that the town of Old Saybrook required Pye & Hogan, for tax purposes, to declare its personal property. The 2004 personal property declaration form was completed by Pye & Hogan, and the 2005 personal property declaration form was completed by the defendant. Neither form declared the electrical components as personal property.

[26] We are not persuaded by the defendant's contention that it "could not have left the [electrical components] at the [property] until the case was resolved because if it had vacated without taking the [electrical components], they may have become part of the [property] permanently." For support, the defendant quotes from *Koslik* v. *Sponzo*, Superior Court, judicial district of Hartford, Housing Session, Docket No. CVH-7040, 2010 WL 2306752, *13 (June 4, 2010), for the proposition that "[f]ailure to remove trade fixtures can result in a forfeiture which means the fixtures become part of the realty and the owner of the fee is vested with title in the fixtures." *Koslik*, however, is factually distinguishable. Unlike the defendant in the present case, the plaintiff-tenant in *Koslik* installed the trade fixtures.

[27] The following colloquy occurred:

"[The Plaintiff's Counsel]: Your—do you concede that your company expressed concerns that Donald . . . would compete against them at that time?

"[Bromley]: Well, we were concerned when he was violating—he had violated his noncompeting agreement—

"[The Plaintiff's Counsel]: Okay.

"[Bromley]: —because he'd [already] tried to start a business in competition with us. . . .

"[The Plaintiff's Counsel]: In the later part of 2009, did your company raise concerns that [Donald] would be competing against them?

"[Bromley]: I wasn't happy. But I don't think I was concerned about him being a competitor.

"[The Plaintiff's Counsel]: And didn't your company even raise that same concern when you sought a protective order when we asked to inspect the Chester premises [where the defendant relocated in 2009] to inspect the bus duct? Didn't you raise the concern about Mr. Woods' competition at that time?

"[Bromley]: It might have been part of that complaint."

[28] William Wadsworth testified in relevant part:

"[The Plaintiff's Counsel]: How—how often would the—might this water intrusion occur?

"[Wadsworth]: Heavy rain. We'd get some. The windows might leak, which they repaired, and maybe someone would mess with it and they would open up again. But other than behind the machines and that one spot, I don't recall much water there other than what—when we were filling the machine, we might spill."

───────────────